efficacy disclosure from the prior art patent. So what was new? If there was some sort of practice that was needed by the clinician, that was already disclosed in the prior art immediate release 288 patent. So I think that's kind of a red herring argument here. They disclosed in the prior art anywhere from 50 to 2,000 mg per day was an appropriate dosage. And in the extended release patent, they said that also was the appropriate dosage for a 50 kilogram person. So I think that that issue, needing a clinician to prescribe the drug, everyone needs a clinician to prescribe the drug, but you have to look at it in the context of the problem to be solved in the patent. What really is different from the prior art in this patent? And that really is two words, a gelling agent. That's it. The problem was trying to solve dose dumping. There's no dispute in ASTRA's briefing that we could find where they disagreed that the solution to dose dumping, that the prior art failed to teach that. Because they can't. It did teach the solution. The Dow reference taught it. The SACO reference taught it. Their own Dr. Davies, who testified in their infringement case, but of course did not testify in their invalidity case, for good reason. He said that the- Nor was he asked about it. He was not asked about it. That's correct. He was not asked about that in the infringement portion of the trial. That's correct. His declaration was introduced into evidence, and he said as of the date of the extended release patent that providing extended release was incredibly well known. It was predictable. AstraZeneca, in their patent, put in the most forgiving, easy to formulate component, that being HPMC. There's absolutely nothing new here. There's nothing that's obvious. The claim is so broad. There's no blood plasma limitations in it. I mean, you're sort of telling me about what you think is sort of the best part of your case. Yes. But you're avoiding the part that you lost on. And I mean, that's what I would have thought you'd be here focused on. I mean, you've wasted all of your time on the other parts, but why aren't you focusing on motivation to combine? Because that's where the district court said you lost. You lost because the prior art was overwhelming in terms of providing reasons why you wouldn't, a skilled artisan, would not make this combination. And he totally rejected Dr. Park, your expert, as cursory, unqualified, lacking credibility. And he fought Mr. Seaman, Mr. Montgomery, and Mr. Calabresi, who were speaking very technically. I mean, I've read all of these transcripts. I mean, Dr. Park tried to tell him the gelling agent was effectively like Jell-O. I mean, he wasn't talking to my children. He was talking to a judge and trying to explain how to decide this case. And Dr. Montgomery, Calabresi, and Seaman came across infinitely more credible with regard to whether one of skill in the art would have done this in light of the state of the prior art, which is what they were supposed to do, not talk about Jell-O. Please ignore my hamburger French fry thing from earlier. But so, you know, I think that the district court rejected the credibility of your expert and found theirs eminently credible. And then there's all the body of prior art that taught away, which is what they were testifying on. So go to that. I mean, you only have a minute and 25 seconds left, but tell me why he erred there, because that was, as I understood it, the basis for his decision. Sure. The motivation and the teaching way, there was no clear teaching way in the prior art. And so, yes, did their experts say that? Sure, they said it. But if you look at the underlying art in the articles, there is no teaching way. There's no clear discouragement to make an extended release. For example, they say that you would have wanted to increase the dose above 750 milligrams a day, correct? Well, fine. Increase it to 2000 milligrams per day. That was in the 288 patent. There's nothing new there. A formulator would have looked at that and said, okay, fine, I'll increase it to 2000 milligrams a day. Maybe I have to make two extended release tablets, but that's a problem that could be solved by a formulator. So that's really not supported by the actual articles. The D2 receptor theory, Dr. Seaman, a few months before the critical day, published a paper saying that it wasn't just D2. There were other theories. There was a D4 theory. There was a 5-HT theory. You've got to look underneath at the literature. There were many theories that were out there. The judge grabbed onto this D2 theory, but Dr. Seaman himself contradicted it. And Dr. Montgomery said no one knew how Seroquel or quetiapine worked as of the time, and they still don't know today. So where is the factual support for these opinions of teaching away? They're just not in the articles. They're not in the prior record. Okay, well, maybe your time is up. Maybe Mr. Roccozzi, am I saying it? Roccozzi. Maybe Mr. Roccozzi could help on this point. I'm not sure if he's planning on it, but since you were sort of midstream, but we have to move on, maybe he can continue. Yes, Your Honor. The fundamental problem with the clinician POSA is this whole teaching away idea that came into the case only when the clinicians were introduced. And the problem is one of both law and fact. Because as this court's president makes clear, to have a teaching away, the prior art has to be grounded in the prior art, has to discourage or discredit the solution in the claims. The solution in the claims here is solving the problem of dose dumping for a water-soluble drug with an HPMC-based dosage form. It's telling- I thought the problem in the solution in the claims was creating a suspended release, i.e. a long-acting version of- Yes, a sustained release. Quetiapine? How do you say it? Quetiapine. Yeah, my law clerk tried to give me a phonetic. He said, think, quit typing, Judge, quit typing. And then you could get it, but it didn't stick. A lot of folks say quetiapine. Okay. Yes, the breadth of the claim is literally quetiapine plus gelling agent, HPMC, and any extended release. No limitations on blood levels or any other pharmacokinetic or pharmacodynamic properties. So this is not the psychobenzaprine type of case. Extremely broad claim. The problem with clinician POSA is you just throw out all the formulator issues that the patent's addressed to. It's telling that there is not a single piece of contemporaneous evidence, 1997 or before, not from a skilled person, not from an inventor, not from Astra, no one expressing this problem or any kind of skepticism or even a slight concern that quetiapine would not benefit from extended release. Well, except for the three experts who testified and who were found to be incredibly credible and have amazing resumes. But despite their credibility determination, Your Honor, the fact is for teaching away, it has to be grounded in the prior art. None of that art said quetiapine. The district court went through, I mean, gosh, on page A67, and it just keeps going for pages and pages and pages, article by article, when all of the art related to quetiapine, which Dr. Seaman and Montgomery relied upon as, see, all this art shows you this is not a good All receptor affinity art regarding clinical efficacy and safety, that has nothing to do with the problem of the patent, number one. Number two, even to be... You're presuming that you're going to win on what the level of skill in the art is. So if you win on the level of skill in the art, then you say, judge, all that art is not considered by my personal skill in the art. But even if that art comes in to support, to survive even clearly erroneous review, the credibility determination still has to follow a factually plausible story that's not contradicted by the evidence. And we can go through the evidence that these experts were trying to testify about, Your Honor, on the effective dose that it should be so high, you wouldn't want extended release. We can look in this record at the Casey paper, Hirsch, Goldstein, Borosin, all say that 250 to 700 migs per day is effective. Now, Dr. Montgomery wanted to say he didn't believe that, but what he believes today has nothing to do with what the skilled person would have seen in 1997. They would have seen that the range that was effective in all the literature was exactly and fell squarely within the range in the 288 prior art patent. Number two, this D2 occupancy theory, again, what Dr. Seaman wants to say today completely contradicts his own 1997 paper, where he said there were multiple theories, D2, D4, serotonin. He didn't say it was just D2. Now he wants to contradict that. That finding can't be upheld when he's contradicting his own literature. That's what the person of ordinary skill would see. I guess I don't understand. I just thought this seemed like quite a simple case to me. You have a whole body of literature that says quetiapine is only reaching, say, roughly a 37% effectiveness at sledgehammering against these D2 receptors. And it's only at help these ill patients with bipolar and schizophrenia, you need to be able to slam at those D2 receptors at 60% to 80% in the first 30 minutes, because if you can't, you're not going to be able to stop them from having a mental break of some sort. And so quetiapine seemed like, from the literature, not an ideal candidate for suspended release, because everyone who's skilled in the art knew when you went in the direction of suspended release, you had a slower ramp-up period. So you're not even going to start with 37% in the first 30 minutes. You're going to have some lesser percent. It's going to take you longer to build up. And with these kinds of patients who are right on the edge, the psychic break, you need to be able to hit those receptors really quick. So that's how I understood the case. Two points on that, Your Honor. First, the literature from Dr. Seaman himself, in 97 and even 99, said that for other anti-psychotics, it was 60% to 80% occupancy. But not for this one. For quetiapine, it said it was 20% to 44%, which means you don't need that high dose or that sledgehammer. But it was only affecting 20% to 44% of the D2 receptors. But you want it to be at 60% to 80%, which is why everybody said it wasn't an ideal drug for treating these kinds of illnesses. Dr. Seaman's paper says that at therapeutic doses, it was 20% to 44% occupancy. Now he said something different at trial. That's the point. He's contradicting his own paper. Well, that seems to me to be a credibility determination, and I don't really see that contradiction. But the paper actually says it, Your Honor. It says at therapeutic doses, quetiapine and clozapine, 20% to 44% occupancy. At the doses that you're giving patients, this is all you're able to have work, 30% to 40% or whatever. That means that it's therapeutic and working at only 20% to 44%, meaning that this whole theory that you need to sledgehammer and go higher is not true. You're eating into your rebuttal time, which I'm happy to let you do. But you did say you wanted to... I will save it for rebuttal, Your Honor. Thank you. Mr. Rank? Yes. May it please the court. Judge Wallach, the answer to your question is you do need a clinician to practice the invention that's claimed, particularly Claim 13. It's separately claimed from the formulation. And defendant's own expert, Dr. Reist, the psychiatrist, a clinician, testified that administering an effective dose requires the knowledge of a physician. That's what physicians do. That's at A17.475. This at bottom is a simple case I submit. The judge, in a very detailed, very comprehensive opinion, made a number of findings of fact, none of which I submit has been shown to be clear error. With respect to motivation, in the words of KSR, there's no need or problem known in the art at the time with respect to the immediate release quetiapine product that provided a reason to make a sustained release product. Now, defendants alleged two reasons, improved compliance and reduced side effects. But the immediate release product was not even on the market at the time, therefore, no known compliance problem. In fact, the literature suggested there would not have been a compliance problem. The literature suggested and taught that twice a day, which was the recommended dose of the immediate release product from the clinical trials, was just as good as once a day in terms of compliance. And in fact, again, Dr. Reist conceded that because immediate release quetiapine was substantially free from the most troublesome side effect of EPS, that it was less likely to have compliance problems. Therefore, there was no reason for a person of ordinary skill to think that a sustained release would work any better than immediate release with respect to compliance. Now, with respect to side effects, in other words, their argument was sustained release would reduce the possible side effects. We asked Dr. Park, the defendant's formulator, what are the side effects of quetiapine? His answer, quote, I don't know. I don't care. No wonder the district court found his testimony not to be credible. No wonder the district court found they hadn't proved by clear and convincing evidence that there was a motivation or a reason to go to sustained from the immediate release. Well, Dr. Park actually even went further, which I think diminished his credibility in the district court's eyes. He said, any suspended release can never be obvious, right? Didn't he say there's an underlying drug that making it a suspended release, it can, it's always obvious every time, all the time. I thought to myself, well, gosh, what if we're talking about sleeping pills? I'd really prefer not to sleep for 24 hours straight. It would seem to lack, you know, uh, credibility to say that every single drug making it into a suspended release would, would always be an obvious choice. That's exactly correct. The district court made a finding at A58 in the opinion that virtually, Park said virtually no patent on sustained release would be non-obvious. Well, if that's the case, we shouldn't be here, but that can't be the law. In this particular case with the record we have in the district court, it's not. In fact, if defendants were correct with respect to their general motivation arguments, you couldn't get a patent on a sustained release product if they were all motivated to make, to improve compliance and reduce side effects. That's clearly not the case based on the evidence that's in this record. With respect to teaching away, one might look at the U.S. versus Adams case, a leading case on the issue. In that case, the court referred to what it called long accepted factors as deterring investigation into what the claim combination was in that case. Here, we have the long accepted factors of the clinical trial literature pointing toward the higher doses. We have the consensus that Dr. Seaman talked about, of you needed 60 to 80 percent D2 receptor occupancy to achieve antipsychotic efficacy. And you have Dr. Calabrese talking about the treatment of acute schizophrenics requiring the sledgehammer. High doses get control of the dangerous symptoms. All three reasons are consistent. They all point toward higher doses. I think as the court acknowledged today, the judge in pages and pages of his opinion went over in great detail the clinical trial literature, as did Dr. Montgomery at trial, I think for 25 pages of testimony. So it's grounded in the literature in answer to the argument of appellants. The literature, according to Dr. Montgomery, which who, by the way, the district court judge found his testimony to be, quote, largely unrebutted, testified that the predominant view was that efficacy was weak, according to the early trials. A number of trials failed. There were specific expressions, such as in the Wetzel paper, that you needed to go to a higher dose to improve and get better efficacy. Similarly, with respect to the D2 occupancy, the Seaman paper that defendants put so much weight on, that is the 1997 paper, in fact, is consistent with Dr. Seaman's testimony at trial. The paper at A3079 refers to a, quote, general rule that therapeutic levels of neuroleptics, which is these kinds of drugs, occupy the D2 receptors. And at A3078, the clinical requirement of 75% D2 receptor occupancy. The paper merely talks about different ways of classifying different atypical drugs. It doesn't diminish or refute Dr. Seaman's unrebutted testimony of the need for that level of D2 receptor occupancy. And in fact, with respect to the Pawlowski paper, which showed, with respect to the clozapine being an exception, and clozapine was the known atypical drug, Dr. Seaman testified that within 60 to 80 minutes, even clozapine occupied about 60% of the receptors. So all of this tends to support his testimony pointing toward the higher doses, meaning that because of the sustained releases, characteristics of a lower peak and a slower release, you can't get to the high dose that you need to get the D2 receptor occupancy, to get efficacy according to the clinical trial literature, and to get the sledgehammer effect. In the words of the district court and the witnesses, sustained release was, quote, contraindicated, or would have been thought to be counterproductive. Even if the person of ordinary skill were found to be just a formulator, I submit that it's harmless error. A formulator alone would not know whether there was a need for a sustained release product. If you separate the should it be made from the could it be made, the formulator doesn't know whether it should be made, whether there was a medical need for it. Putting aside the question of whether it could be made, a reasonable likelihood of success, even there the district court found, based largely on credibility determinations, found that there was no reasonable likelihood of success. Why? Well, the formulators who testified on behalf of the defendants ignored the many possible routes to sustained release. They focused just on the one, the HPMC route, which happened to be the preferred route of the patented issue. Even Dr. Park, their expert, said these other routes were, quote, commonly used at the time to make sustained release. The literature talked about normally being a very difficult task. It's complex, time-consuming. That's at A1078 and A1261. Dr. Park opined that making a sustained release would have been easy, but he used hindsight. He started with the claims and worked backwards to see where in the prior art he could find HPMC. The number of compound properties that quetiapine had, the art taught, would have been a poor candidate. The combination of large dose size and pH-dependent solubility made it a, quote, poor candidate for sustained release. It's no wonder the court found no reasonable likelihood of success. A few comments about secondary considerations, which the court found to exist in this case and as supporting a conclusion of non-obviousness. With respect to commercial success, there's no doubt about the success commercially of Seroquel XR, which is the patented product. It sells over a billion dollars a year. Frequently, those kinds of drugs are called blockbusters. The only issue is Nexus that really is at issue here. Now, the evidence indicated that the sales of the product were due to the patented invention. That is, the fact that it was sustained release. Sales increased after new indications of treating bipolar depression and major depressive disorder, after those indications were obtained in 2009 and 10. There was testimony about a hockey stick. The sales went up like a hockey stick. Because why? Physicians preferred the XR product over the immediate release product because for these depressed patients, they were better able to tolerate the drug when given appropriately the next day. So these high-functioning people who happen to suffer from either bipolar disorder or major depressive disorder could function better the next day. Physicians liked it. Patients liked it. That's why the sales went up. As to the effect of the earlier 288 prior patent that covered the compound, defendants argue that it was blocking. You shouldn't consider commercial success or at best it was weak. Well, if that were true, the market for the XR product would have collapsed in March of 2012 when the exclusivity given by the first patent disappeared. In fact, what happened? XR sales have gone up by a couple of hundred million dollars. Clearly, there's no relationship between the two. As to unexpected results, there's no doubt that Quetiapate Cervical XR has a unique combination of approvals from the FDA. It's the only drug in the world to be approved for both for treating both bipolar depression and major depressive disorder. Let me just say in conclusion that the brief arguments about there's no invention here, there's no difference over the prior compound patent, it's pharmaceutical evergreening, etc. is a real invention here. Why do I say that? I say that because this product has helped seriously ill patients. They prefer it. They take it. They like it. The physicians like it. That's why they prescribe it. That's why physicians prefer it. There is an invention here and it wasn't presaged by or suggested by the prior art. In fact, the prior art and the unrebutted credited testimony of the AstraZeneca experts made clear that there was no motivation to make it. Their motivation arguments failed and the finding of no reasonable likelihood of success was well supported by the record. Thank you. Mr. Rank? Mr. Posey? Thank you, Your Honor. Very quickly on the teaching away point. In addition to contradicting his own publications, Dr. Seaman was also contradicted by other Astra witnesses, Dr. Montgomery, Dr. Nyberg. The mechanism of action of atypicals was not known in 1997 and it's not known today. So we submit it's both legal and factual error to turn basically what's an unknown mechanism of action or a black box into a teaching away. Number two, this whole sledgehammer idea. Dr. Calabrese admitted at trial that applies only to acute or treatment resistant patients. It doesn't apply to the majority of patients who need a lifetime controller medication. So the sledgehammer effect can't be a teaching away either. Very quickly on the clinician POSA. Your Honor mentioned the guy who prescribes the medication. Why can't he be the POSA? The problem is every pharmaceutical invention would have a clinician wrapped in. The fact is the art here is not about clinical efficacy or treatment. There is no clinical efficacy data in this patent. There's certainly nothing about D2 receptor occupancy theories, nothing. And when the clinician POSA was introduced into the case, it basically rewrote that specification from a patent about solving a formulation problem to now about a question of, well, will Colcutt quetiapine work? Everyone knew it would work from the 288 patent. We have the effective dose, we have the effective rate. They knew it would work. That's why a formulator would put it into a sustained early formulation with a reasonable expectation of success. Number four, on these other routes of sustained release, Dr. Park didn't use hindsight. It can't be hindsight when the prior art discloses the exact same problem in the patent and the exact same solution. The experts looked at HPMC-based dosage forms because as the art taught, the Dow manual, SACO 138 application, it's the cheapest and easiest sustained release method to use. It's been around for decades. Time out. SACO wasn't a sustained release. So SACO was sustained release, your honor. SACO was, you build a shell around it and you don't let it eke out at all till it gets into the bowel. SACO was about building a shell to prevent it from getting out, not having it eke out over time, but rather prevent it from eking out at all, like an egg. SACO built a shell around the egg and then cracked the egg when it gets in the bowel. But that covers this claim. This claim is putiapine plus HPMC plus any release over the IR. That's the simplicity and the objective reach of this claim, your honor. It has no release profile. Dr. Prudhomme admitted at trial, there's no release limitations at all in this claim other than more than immediate release. There's no blood levels. There's no in vitro release dissolution profile. But SACO would tell you, as I understand it is, you can build, you can use this gelling agent to build a shell around it and prevent it from eking out at all until it gets to a certain point in the body or until a certain amount of time has passed. That, to me, doesn't seem like a notion that one of skill in the art looking at quetiapine would think, aha, let's do this for quetiapine. Let's build a shell around it, have it not release anything at all until 12 hours later or until it gets into the bowel. But then it does release with the exact same type of HPM release. But the question is, would one of skill in the art have been motivated to go to SACO, given what it teaches and use that principle to apply it to quetiapine? But even if we would submit, yes, but even if not SACO, the 138 application is the exact same vehicle that Seroquel XR uses. The same HPMC grades, the same amounts, everything. It even addresses the water-soluble drug problem in almost the same words that the 437 patent said it was trying to solve. We submit that can't be hindsight when the art identifies the exact same problem in the exact same solution. That's what Dr. Park was saying was so simple and easy because we have here, again, it's not like cyclobenzaprine. This is no release limitations whatsoever. And on the other end of the spectrum, you have much more complex release mechanisms. But again, this is just HPMC plus Seroquel, a known molecule and the oldest of HPMC-based release mechanisms. We submit this is classic pharmaceutical evergreening. You're taking an expired compound, sticking it into a known release. Your time is up. I thank all the council for their helpful arguments. The case is submitted.